## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **EP-20-CR-2451-DB** |
| | § | |
| **JOSE LUIS BOJORQUEZ** | § | |

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

On this day, the Court considered Defendant Jose Luis Bojorquez's ("Mr. Bojorquez") "Motion to Suppress Evidence with Incorporated Memorandum of Law" ("Motion"), filed on May 17, 2021. ECF No. 41. The Government filed a "Response in Opposition" ("Response") on May 27, 2021. ECF No. 42. After due consideration, the Court is of the opinion that the Motion should be granted in part and denied in part.

## BACKGROUND

Mr. Bojorquez entered the El Paso Port of Entry ("POE") from Mexico on Monday, October 27, 2020. Mot. 1, ECF No. 41. He was instructed by U.S. Immigration and Customs Enforcement ("ICE") agents to sit and wait to be interviewed. *Id.* at 3. While waiting, he was handcuffed. *Id.* at 4. He was then moved to a room for questioning and was handcuffed to a chair. *Id.* After waiting for a period of about an hour, two Customs and Border Protection agents entered the room. *Id.* One of the agents then immediately took possession of Bojorquez's phone. *Id.* An agent began to question Mr. Bojorquez. *Id.* After the interview had progressed for about four minutes, the agent read Mr. Bojorquez his *Miranda* rights. *Id.* at 4–5. After doing so, the agent continued to question Mr. Bojorquez. *Id.* at 5. The two agents initially present were later joined by a third, who also questioned Mr. Bojorquez. *Id.* at 6. Questioning continued until all agents exited the room, roughly forty minutes after the questioning had begun. *Id.*

Mr. Bojorquez argues that he was "illegally detained and arrested," as he was detained "without a warrant and without probable cause in violation of his[] rights under the Fourth, Fifth, and Fourteenth Amendments." *Id.* at 7–8. On that basis he argues for suppression of "'[a]ll statements . . . at or subsequent to his detention . . . on October 27, 2020" and of any "testimony of any law enforcement officers . . . and all persons present at or near the location of the arrest of Defendant Bojorquez." *Id.* at 7.

Mr. Bojorquez also argues that the agents, prior to informing Mr. Bojorquez of his *Miranda* rights, asked questions that "address the elements and gravamen of Count 1, [Providing False Information on Records Required to be Maintained by a Federal Firearms Licensee]" and that the agents, after informing him of his rights, "interrogated [him] with the same questions posed to [him] pre-*Miranda*." *Id.* at 6–7. He thus moves in the alternative to suppress at least some part of his pre-and post-*Miranda* statements as "contrary to the 5th Amendment." *See id.* ("[T]he statements provided by Defendant Bojorquez, at least to Count 1, were contrary to the 5th Amendment.").

The Government argues that Mr. Bojorquez's arrest and detention were based on "[s]ufficient [a]rticulable [f]acts" and were thus proper. Resp. 8–9, ECF No. 42. The Government also argues that any pre-*Miranda* questioning of Mr. Bojorquez was "preliminary and made for routine identification purposes" and that questions regarding Mr. Bojorquez's "*current* address, employment, identification, and marital status do not go to Count One as charged in the Indictment." *Id.* at 5. The Government argues further that Mr. Bojorquez intelligently and voluntarily waived his *Miranda* rights and that his post-*Miranda* statements are therefore admissible. *Id.* at 9–14.

2

**LEGAL STANDARD**

A defendant seeking to suppress evidence illegally obtained must move to do so before trial. Fed. R. Crim. P. 12(b)(3)(C). The burden is generally on the defendant to prove, by a preponderance of the evidence, that the evidence in question was obtained in violation of his rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001); *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing.").

**1. Fourth Amendment Protections Against Warrantless Search and Seizure**

The Fourth Amendment guarantees individuals the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A "seizure" may consist of either "physical force" or a "show of authority" that "in some way restrain[s] the liberty" of the person." *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968). Evidence obtained in "violation of the Fourth Amendment will be suppressed and excluded from consideration." *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014).

A seizure or detention of a person amounts to an arrest when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Windham v. Harris County, Tex.*, 875 F.3d 229, 240 (5th Cir. 2017) (quoting *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015)). Such a seizure must be supported by probable cause. *Id.* at 239. Probable cause exists when the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Piazza*

3

*v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)) (internal quotations omitted).

Certain other seizures that are "substantially less intrusive than arrests" may be deemed reasonable upon "grounds less rigorous than probable cause." *Dunaway v. New York*, 442 U.S. 200, 210 (1979) (discussing *Terry*).

Warrantless seizures—including arrests—are "*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *United States v. Buchanan*, 70 F.3d 818, 825 (5th Cir. 1995) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (internal quotations omitted). Thus, when a law enforcement officer acts without a warrant, the government has the burden of proving by a preponderance of the evidence that a challenged search or seizure was constitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

### 2. Fifth Amendment: Pre-*Miranda* Interrogation

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Evidence obtained in violation of the Fifth Amendment must be suppressed and cannot be used at trial. *See Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (explaining that the Fifth Amendment prohibits the use of compelled testimony at trial); *Mapp v. Ohio*, 367 U.S. 643, 657 (1961) (explaining that the exclusionary rule requires "that no man . . . be convicted on unconstitutional evidence").

In *Miranda*, the Supreme Court held that a person subjected to a custodial interrogation must be given certain warnings designed to safeguard his or her Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). To further safeguard those rights, the

4

Supreme Court has held that "[w]hen police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Elstad*, 470 U.S. at 317.

*Miranda* warnings are only required when an individual "is taken into 'custody' or his freedom has otherwise been significantly restrained." *Id.* at 309 (quoting *Miranda*, 384 U.S. at 478). "A person is 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Crawford*, 52 F.3d 1303, 1307 (5th Cir. 1995) (quoting *United States v. Pofahl*, 990 F.2d 1456, 1487 (5th Cir.), *cert. denied*, 510 U.S. 996 (1993)) (internal quotations omitted). While "no talismanic incantation" of an individual's rights is required, the warnings are not effective unless and until they "fully convey[] . . . his rights as required by *Miranda*." *See California v. Prysock*, 453 U.S. 355, 359, 360—61 (1981) (holding that warnings were effective because they did not "suggest[] any limitation on the right[s]" enumerated in *Miranda*).

The defendant bears the initial burden of establishing that he was subjected to a custodial interrogation. *United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984). Once the defendant establishes a prima facie case of custodial interrogation, the burden shifts to the government to establish that any waiver of the defendant's Fifth Amendment rights comported with the requirements of *Miranda* and its progeny. *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).

5

### 3. Fifth Amendment: Midstream Warnings

A suspect may make statements to law enforcement officials both before and after being informed of his rights under *Miranda*. "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318. When no deliberate strategy is used to undermine the effectiveness of the *Miranda* warnings, "the admissibility of postwarning statements continues to be governed by the principles of *Elstad*." *United States v. Nunez-Sanchez*, 478 F.3d 663, 667–69 (5th Cir. 2007) (quoting *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir.2006)) (internal alterations omitted).

However, when a "deliberate two-step strategy" is employed by law enforcement agents, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *United States v. Seibert*, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring); *see also Courtney*, 463 F.3d at 338 (5th Cir. 2006) (identifying Justice Kennedy's approach as the Supreme Court's holding in *Seibert*). For these post-warning statements to be admissible, such measures must "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

### ANALYSIS

The Court first determines that Mr. Bojorquez was subject to custodial arrest, a fact central to the entirety of the Court's analysis. It then determines that the Government has overcome the presumption that a warrantless arrest is unlawful, as it finds that there was

6

probable cause to arrest and detain Mr. Bojorquez. It then turns to Mr. Bojorquez's pre-*Miranda* statements and then to his post-*Miranda* statements. It finds that all of Mr. Bojorquez's pre-*Miranda* statements and certain of his post-*Miranda* statements must be suppressed.

### 1. Mr. Bojorquez was subjected to custodial interrogation.

"A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir. 1988). "A determination of whether a defendant is in custody for *Miranda* purposes depends on the totality of circumstances." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983)) (internal quotations omitted). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. N. Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Cavazos*, 668 F.3d at 193 (quoting *Bengivenga,* 845 F.2d at 596).

Mr. Bojorquez's situation does not present a close call under this standard for "custody." The Court first looks to the "the circumstances surrounding the interrogation." *J.D.B.,* 564 U.S. at 270. Mr. Bojorquez asserts in the Motion that upon being stopped at the

7

POE, Mr. Bojorquez was advised by the agents that he couldn't leave and was handcuffed and left to wait in the waiting room for thirty minutes. Mot. 4, ECF No. 41. He then states that he was transferred to an interrogation room and left to wait an hour before being questioned. *Id.* The Government does not directly dispute Mr. Bojorquez's description of events before the interview but instead merely states that Mr. Bojorquez was "encountered . . . and placed in an interview room." Resp. 2–3, ECF No. 42. He was "handcuffed to a chair in an interview room, per policy and for Officer safety," and "[his] cell phone was also taken from him." *Id.* at 2–3. Appropriately, "[t]he Government concedes that at the time of the interview, [Mr. Bojorquez] was not free to leave." *Id.* at 3 n.1.

The Court finds that Mr. Bojorquez's undisputed assertions about the events leading up to his interrogation show that he was not in fact free to leave. Moreover, "a reasonable person" could not "have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.,* 564 U.S. at 270. A reasonable person, "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances," *Cavazos,* 668 F.3d at 193, would have understood the combination of physical restraints and verbal instruction not to leave as a "restraint on [his] freedom of movement of the degree which the law associates with formal arrest," *Bengivenga,* 845 F.2d at 596. Thus it finds that Mr. Bojorquez was in custody from the time he was instructed to enter the offices at the POE.

### 2. Agents had probable cause to arrest and detain Mr. Bojorquez.

Mr. Bojorquez argues that he was "illegally detained and arrested." Mot. 7, ECF No. 41. He argues further that "[a]ll statements made by [Mr. Bojorquez] at the time of and subsequent to his detention and arrest were products of his illegal detention and arrest." *Id.* at 8.

8

The Government argues to the contrary that Mr. Bojorquez was detained on the basis of "sufficient articulable facts." Resp. 9, ECF No. 42. It argues that the "arrest and detention were made because of the recovery of a firearm registered to [Mr. Bojorquez] at a Mexican crime scene." *Id.* at 8. The Government states that U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents had "traced [the firearm's] unique serial number to an ATF Form 4473 which had been completed by Defendant." *Id.* at 9. The agents then "placed a TECHS hit to refer Defendant for questioning about the recovered firearm." *Id.*

Although the burden is generally on the defendant to prove, by a preponderance of the evidence, that the evidence in question was obtained in violation of his rights, *Guerrero-Barajas*, 240 F.3d at 432, the burden is shifted to the Government in this case because Mr. Bojorquez was detained without a warrant. *Waldrop*, 404 F.3d at 368.

The Government cites cases which allow police to proceed on the basis of "reasonable suspicion," which "requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." Resp. 8, ECF No. 42 (quoting *United States v. Rodriguez*, 564 F.3d 735, 740–41 (5th Cir. 2009)). They argue that the ATF's recovery of a firearm traceable to Mr. Bojorquez and the placement of an alert provide such reasonable suspicion. *Id.* at 9.

The cases and the standard articulated in the cases discussed by the Government are irrelevant and even misleading. *See id.* at 8–9. The "reasonable suspicion" standard cited by the government applies only to seizures "substantially less intrusive than arrests." *Dunaway*, 442 U.S. at 210. *Rodriguez*, from which the Government draws its "reasonable suspicion" standard, concerned a traffic stop of a vehicle by a police officer in a patrol car—a situation far removed

9

from Mr. Bojorquez's. "[A]n investigative stop"—such as the one at issue in *Rodriguez*—
"needs only reasonable suspicion," but "[a]n arrest, on the other hand, demands the greater
showing of probable cause." *Windham*, 875 F.3d at 239. The Government appears to
acknowledge, perhaps inadvertently, that Mr. Bojorquez's detention amounted to an arrest rather
than any "lesser intrusion"; several times it refers to his "arrest" even while ignoring the
implications of such a description. Resp. 8, 9, ECF No. 8.

Mr. Bojorquez's seizure was in fact "in important respects indistinguishable from
a traditional arrest." *Dunaway*, 442 U.S. at 212. He was stopped on his way to work and moved
to a different area for questioning, was made to wait for over an hour before such questioning,
and was handcuffed to a chair while waiting and again handcuffed during questioning. *See* Mot.
3–4, ECF No. 41; Resp. 2–3, ECF No. 42. Moreover, he was told that he couldn't leave and had
his phone taken away. Mot. 4, ECF No. 41. Under the circumstances, "a reasonable person in
the suspect's position would have understood the situation to constitute a restraint on freedom of
movement of the degree which the law associates with formal arrest.'" *Windham*, 875 F.3d at
240. As such, Mr. Bojorquez's detention must be justified by a finding of probable cause. *Id.* at
239.

Moreover, the Supreme Court has stated clearly that "detention for custodial
interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth
Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway*,
442 U.S. at 216. The Government states quite clearly that Agents "placed a TECHS hit to refer
[Mr. Bojorquez] for questioning," *see* Resp. 9, ECF No. 42, and was, upon being stopped,
"placed in an interview room due to a TECHS hit." *Id.* at 2. Thus the sole purpose of the stop

10

was to subject Mr. Bojorquez to interrogation.  The Court has already determined that Mr. Bojorquez was in custody from the time he was brought into the offices at the POE.  *See supra* 6–8.  Thus, Mr. Bojorquez's detention was "for custodial interrogation" and was valid only if supported by probable cause.  *See Dunaway*, 442 U.S. at 216.  Further, the Government has the burden of showing that the arrest was valid.  *Waldrop*, 404 F.3d at 368.

The Court finds that the Government does meet its burden and that the actions of the agents were supported by probable cause.  Probable cause exists where the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)) (internal quotations omitted).  Such facts "must be known to the officer at the time of the arrest." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (citing *Sibron v. New York*, 392 U.S. 40, 62–63 (1968)).  Further, the facts must be particularized to the individual being arrested.  *Id.* (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).  The officer need only have probable cause to believe that *some* offense had been, was being, or would be committed, "whether or not the officer charged the arrestee with that specific offense." *Id.* (citing *Devenpeck v. Alford,* 543 U.S. 146, 153–54 (2004)).

The Court is uncertain of the value of the "TECHS hit" cited by the Government in establishing probable cause on its own.  Resp. 9, ECF No. 42.  In particular, the Court has no information about the relative frequency of such "hits" and, more importantly, whether they are generally associated with criminal activity rather than, say, shortcomings of the database itself.

However, the Court finds that the tracing of a firearm used in a crime in Mexico directly to Mr.

Bojorquez via the firearm's serial number, in combination with indications that Mr. Bojorquez

did not in fact live at the address listed on the form used to purchase the firearm, created

probable cause to arrest Mr. Bojorquez. *Id.* at 1–2, 9; see also Mot. 2–3, ECF No. 41. As

required, the officers that detained Mr. Bojorquez knew of these facts at the time of his

detention. *Club Retro*, 568 F.3d at 204. The serial number attached to the firearm

"particularized" the potential offense directly to Mr. Bojorquez, and the investigation of Mr.

Bojorquez's address related solely to him. *Id.* The fact that the firearm was recovered in a crime

scene, combined with indication that Mr. Bojorquez may have been living in Juarez, Mexico,

would suggest to a reasonable officer that Mr. Bojorquez may have committed *some* crime,

whether related to the incident leading to the seizure of the gun or related to the firearm itself.

*Id.* Thus, these facts "would warrant a prudent person, or one of reasonable caution, in believing

. . . that the suspect has committed . . . an offense." *Piazza*, 217 F.3d at 245–46.

Because Mr. Bojorquez's seizure was supported by probable cause, it did not

violate the rights guaranteed to him by the Fourth Amendment. The Court will therefore deny

Mr. Bojorquez's motion insofar as it argues for suppression of evidence based on the asserted

illegality of his arrest and detention.

### 3. Mr. Bojorquez's pre-*Miranda* statements will be suppressed.

The Court has found that Mr. Bojorquez was subject to custodial interrogation.

*See supra* 7–8. Thus any statements made by Mr. Bojorquez before he was fully informed of his

*Miranda* rights must be suppressed unless some exception applies to those statements. *Elstad*,

470 U.S. at 317; *Prysock*, 453 U.S. at 359. The Government argues that the pre-*Miranda*

12

statements Mr. Bojorquez seeks to suppress were given in response to requests for "preliminary" questions and are thus admissible. *See* Resp. 5–8, ECF No. 42. Mr. Bojorquez argues that the questions were "meant to elicit the information that goes to the gravamen of Count 1, [Providing False Information on Records Required to be Maintained by a Federal Firearms Licensee]." *See* Mot. 7, ECF No. 41. The Court finds no exception applicable to Mr. Bojorquez's pre-warning statements, and thus it will hold that the statements must be suppressed.

In *Pennsylvania v. Muniz*, a plurality of the Supreme Court stated that an exception to *Miranda*'s requirements existed for "routine booking question[s]" asked "to secure the biographical data necessary to complete booking or pretrial services." 496 U.S. 582, 601 (1990) (plurality opinion) (internal quotation omitted). The Fifth Circuit now recognizes such a "booking exception" to the dictates of *Miranda*. *United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019); *see also Presley v. City of Benbrook*, 4 F.3d 405, 408 n. 2 (5th Cir.1993) ("In the wake of *Muniz*, it has been universally accepted by courts, both federal and state, that a routine booking question exception to the Fifth Amendment exists."). The Fifth Circuit has clarified the nature of this "booking exception," stating that "[t]he permissible booking questions include data such as a suspect's name, address, height, weight, eye color, date of birth, and current age." *Presley*, 4 F.3d at 408. It has also put limits on the exception, stating that "questions designed to elicit incriminatory admissions are not covered under the routine booking question exception." *United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019) (quoting *Virgen-Moreno*, 265 F.3d 276, 293–94 (5th Cir. 2001)).

In Mr. Bojorquez's case, it is obvious that the relevant questions were not part of any effort to "complete booking or pretrial services," *Muniz*, 496 U.S. at 601, for the simple

reason that Mr. Bojorquez was not being booked, being offered any pretrial services, or subjected to any analogous formal procedure. Rather, he was being detained entirely for the purpose of custodial interrogation without being formally subjected to arrest. Moreover, while "booking questions include data such as a suspect's name, address, height, weight, eye color, date of birth, and current age," *Presley*, 4 F.3d at 408, the facts about Mr. Bojorquez's residence were not treated as routine "data" to be gathered; rather, they were the subject of repeated questions and attempts at clarification. *See* Transcript 4, ECF No. 41-1.

   The Court disagrees with Mr. Bojorquez's suggestion that any statements must be suppressed because of the relationship between certain questions and the indictment. *See, e.g.,* Mot. 7, ECF No. 41. However, it does find that the relationship between the questioning and the purpose of Mr. Bojorquez's detention is relevant. The Government admits that Mr. Bojorquez was brought in for questioning on the express basis that "it was suspected that [Mr. Bojorquez] did not live at the [address] as stated in ATF Form 4472." Resp. 9, ECF No. 42. Thus, questions about Mr. Bojorquez's address and the duration of his residence were almost certainly "designed to elicit incriminatory admissions," and therefore, under the law of this circuit, they "are not covered under the routine booking question exception," *Arellano-Banuelos*, 912 F.3d at 868.

   The Court will not individually address each case cited by the government. Each ultimately derives from the law of *Miranda* and its narrow "booking exception," as articulated by the Supreme Court and the Fifth Circuit. That law, which is both clear and binding on this Court, requires that all of Mr. Bojorquez's pre-*Miranda* statements be suppressed.

14

### 4. Mr. Bojorquez's post-*Miranda* statements relating to the substance of his pre-*Miranda* statements will be suppressed.

When *Miranda* warnings are delayed and thus occur in mid-interrogation, rather than at the outset of questioning, issues arise as to the admissibility of statements made by the accused after the issuance of the warnings. The law governing this situation contains few bright lines. In *Elstad*, the Supreme Court held that statements made by the accused after a valid waiver of his *Miranda* rights are admissible in court, even where they overlap with the accused's pre-*Miranda* statements, as long as the post-*Miranda* statements were "knowingly and voluntarily made" within the meaning of the Fifth Amendment. *Elstad*, 470 U.S. at 309. In so holding, the Court cautioned that "[f]ar from establishing a rigid rule, we direct courts to avoid one." *Id.* at 318.

Subsequently, the Court held in *Seibert* that in certain circumstances, statements given after a purported *Miranda* waiver which repeated statements given before the waiver would be inadmissible. *Seibert*, 542 U.S. at 604. The Court disagreed, however, on exactly what circumstances would make such statements inadmissible. A plurality held that the inquiry should focus on whether the *Miranda* warnings delivered in the middle of an interrogation had "served their purpose." *Id.* at 617. In concurrence, Justice Kennedy stated that courts should focus on whether *Miranda* warnings had been initially withheld as part of a "deliberate two-step strategy" to undermine the effectiveness of the warnings. *Id.* at 622. In such cases, Justice Kennedy stated, post-warning statements should be suppressed unless appropriate "curative measures were taken." *Id.* If they were not, he stated, then the principles of *Elstad* would still govern. *Id.*

15

The Fifth Circuit has determined that Justice Kennedy's concurrence, as "the "position taken by [the] Member[] [of the Court] who concurred in the judgments on the narrowest grounds," contains the "holding" of *Seibert* that binds lower courts, including this one. *Courtney*, 463 F.3d at 338 (quoting *Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Personnel of Tex., Inc.*, 343 F.3d 355, 358 (5th Cir.2003)). Thus this Court will follow Justice Kennedy's approach, which "requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken." *Id.* (citing *Seibert,* 542 U.S. at 622).

The Court will first determine whether a "deliberate two-step strategy [was] used." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring); *see also Nunez-Sanchez*, 478 F.3d at 667–69 (applying *Seibert*). Finding that the agents did employ such a strategy, the Court will examine whether appropriate "curative measures" were taken. Then, finding that no such measures were taken, it will conclude that any post-*Miranda* statements which relate to the substance of Mr. Bojorquez's pre-*Miranda* statements must be suppressed.

### a. The evidence suggests that the agents used a "deliberate two-step strategy" to undermine the effectiveness of the *Miranda* warnings.

In determining whether a deliberate strategy was used, the Court begins with Justice Kennedy's opinion in *Seibert*, which contrasts the facts of *Elstad* and *Seibert* as he understood them. "In *Elstad*," Justice Kennedy writes,

> a suspect made an initial incriminating statement at his home. The suspect had not received a *Miranda* warning before making the statement, apparently because it was not clear whether the suspect was in custody at the time. The suspect was taken to the station house, where he received a proper warning, waived his *Miranda* rights, and made a second statement.

16

*Seibert*, 542 U.S. at 619.

> The facts of *Seibert* itself, however, "present[] different considerations":

> The police used a two-step questioning technique based on a deliberate violation of *Miranda*. The *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given. . . . [T]he two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. . . . This tactic relies on an intentional misrepresentation of the protection that *Miranda* offers and does not serve any legitimate objectives that might otherwise justify its use. Further, the interrogating officer here relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial. The postwarning interview resembled a cross-examination. The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them. . . . This shows the temptations for abuse inherent in the two-step technique. Reference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating. The implicit suggestion was false.

*Seibert*, 542 U.S. at 620–21.

In sharp contrast with the situation in *Elstad*, where the initial questioning occurred at the suspect's house, the initial questioning of Mr. Bojorquez occurred in an office controlled by the agents with the suspect handcuffed to a chair. Thus, Justice Kennedy could state that the officers in *Elstad* had failed to warn the suspect "because it was not clear whether the suspect was in custody at the time." *Id.* at 619; *see also Elstad*, 470 U.S. at 315 (stating that failure to warn "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation'").

This Court cannot similarly conclude that the failure to warn Mr. Bojorquez was a good-faith mistake or the result of any "confusion." Rather, the circumstances of Mr. Bojorquez's detention and interrogation strongly suggest that the agents used a "two-step

questioning technique based on a deliberate violation of *Miranda*." *Seibert*, 542 U.S. at 620. The *Miranda* warning was withheld using just the two-step strategy" decried by Justice Kennedy.  First, there can be no doubt that Mr. Bojorquez was in the custody of law enforcement at the time of his interrogation and thus that the agents should have provided *Miranda* warnings immediately.  *See supra* 7–8.  In such circumstances the delay could not possibly "serve any legitimate objectives."  *Seibert*, 542 U.S. at 621.  There was, for example, no immediate threat to the safety of the public; the agents never sought a warrant for Mr. Bojorquez's arrest.  Instead, the agents took advantage of a perceived opportunity to interrogate Mr. Bojorquez.

Second, the way in which the warnings were eventually delivered suggests an ongoing attempt to minimize their importance.  Before giving the warnings, the agent stated that "since they stopped you, I have to read you your rights. . . I mean it's no big deal, it's just cuz [sic] I have you here . . ."  Transcript 3, ECF No. 41-1 (ellipses in original).  Even upon so stating, the officer continued to delay giving Mr. Bojorquez the required warnings, instead asking several questions about Mr. Bojorquez's current and past residences.  *Id.* at 3–4.  He then stated that "I'm just going to go ahead [and] read you this rights real quick" and, after reading the warnings, instructed Mr. Bojorquez to "just go ahead and sign right here, please . . . say you understand your rights . . ."  *Id.* at 5.  Before Mr. Bojorquez signed the waiver of rights, the agent added that he would "try to make it quick so you can get [to work]."  *Id.*

Lastly, as in *Seibert*, "[t]he postwarning interview resembled a cross-examination," during which the questioning agent "relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial" and "confronted the defendant with [his] inadmissible prewarning statements and pushed [him] to acknowledge

18

Case 3:20-cr-02451-DB   Document 49   Filed 08/24/21   Page 19 of 23

them." *Seibert*, 542 U.S. at 620–21. The agent who gave the mid-interrogation warnings based his post-warning questions about Mr. Bojorquez's residence largely on Mr. Bojorquez's answers to his pre-warning questions about his residence, during which Mr. Bojorquez stated that he had been living in Juarez for five years. *See* Transcript 15, ECF No. 41-1. Before Mr. Bojorquez had said anything about his address, the agent asked: "You didn't lie on anything [on the form]? Okay. So, you said that you have been living in Juarez since 2017." *Id.* "And you weren't living there . . . Right?" *Id.* "No. You didn't live there." *Id.* As Justice Kennedy wrote, "[r]eference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating." *Seibert*, 542 U.S. at 621. These circumstances strongly suggest to this Court that, as Justice Kennedy writes in *Seibert*, "[t]he *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given. . . ." *Id.*

Thus the Court concludes that Mr. Bojorquez has shown that a deliberate two-step strategy was in fact used. The Court must next determine whether the questioning agents took "curative measures."

Before doing so, the Court notes, in the interest of thoroughness, that Mr. Bojorquez's statements would be inadmissible, without need for a second inquiry, under the approach articulated by the *Seibert* plurality, which focuses on whether the *Miranda* warning itself was "effective" rather than whether the withholding was "deliberate." *Seibert* 542 U.S. at 615. Like Justice Kennedy in his concurrence, the plurality focused on differences between the facts immediately before it and those in *Elstad*, pointing to "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two

19

statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.*

Though the "completeness" and "detail" of the "first round of interrogation" are difficult to evaluate in Mr. Bojorquez's case, as lying about an address on a form is not a complex or detailed affair, the Court again notes the emphasis placed on Mr. Bojorquez's residence by the initial questioning agent. *See supra* at 13–14. Further, the agent did not provide the warnings until after getting the information he needed. Moving to the next factor, the Court observes that the two statements—pre- and post-warning—did have "overlapping" content inasmuch as they both related to the duration of Mr. Bojorquez's residence at different addresses.

The remaining factors mentioned by the plurality all weigh heavily in favor of a finding of ineffectiveness. The timing and setting of the questioning was unchanged after the warning, and the personnel was identical save the addition of an additional officer some time after the *Miranda* warning had been given. As discussed, the interrogators treated the second round as completely continuous with the first, even minimizing the importance of the warnings themselves and continuing to ask questions after mentioning the requirement that the warnings be given. Mr. Bojorquez could not, as the suspect in *Elstad* could, see the post-warning questioning "as presenting a markedly different experience" from the pre-warning questioning, and he could not have thought of the post-warning questioning "as presenting a genuine choice whether to follow up on the earlier admission." *Seibert* 542 U.S. at 615–16. Thus, under the plurality's approach, the post-warning statements would be inadmissible.

The Court, continuing with Justice Kennedy's approach, now turns to the determination of whether appropriate curative measures were taken.

### b. No curative measures were taken, and the statements must therefore be suppressed.

Under Justice Kennedy's approach, where a deliberate two-stage strategy is used, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Seibert*, 542 U.S. at 622. Such curative measures must, in Justice Kennedy's words,

> ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.

*Seibert*, 542 U.S. at 622.

The Court finds that the questioning agents took no measure which would "allow [Mr. Bojorquez] to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* There was no break in time or change in circumstances. *See* Transcript 3, ECF No. 41-1. Moreover, the agent stated that the warnings were merely obligatory ("since they stopped you, I have to read you your rights"), that they were "no big deal" and that he would read them "real quick." Transcript 3, ECF No. 41-1. Such statements seem calculated to *prevent* Mr. Bojorquez from thinking "that the interrogation ha[d] taken a new turn." *Seibert*, U.S. at 622.

21

Because no curative measures were taken by the agents questioning Mr. Bojorquez, any "postwarning statements that are related to the substance of prewarning statements must be excluded." *Id.*

## CONCLUSION

The Court will grant in part and deny in part Defendant Jose Luis Bojorquez's "Motion to Suppress Evidence With Incorporated Memorandum of Law," filed on May 17, 2021.

Mr. Bojorquez was not detained in violation of the Fourth Amendment. However, because Mr. Bojorquez was subjected to custodial interrogation, he was entitled to certain protections under the Fifth Amendment, including the communication of his *Miranda* rights prior to the start of questioning, rather than in the middle of questioning.

All of Mr. Bojorquez's pre-*Miranda* statements will be suppressed. And because the agents employed a deliberate strategy to undermine the effectiveness of the *Miranda* warnings once they were given and failed to take any curative measures, Mr. Bojorquez's post-*Miranda* statements that relate to the substance of his pre-warning statements will also be suppressed. However, the Court finds that Mr. Bojorquez's arrest and detention were not unconstitutional, and thus all other statements made after the waiver of his *Miranda* rights are admissible.

Accordingly, Mr. Bojorquez's Motion will be granted to the extent that it requests suppression of Mr. Bojorquez's pre-*Miranda* statements and any post-*Miranda* statements that are related to the substance of those pre-*Miranda* statements, and it will be denied to the extent that it requests any further remedy.

22

**IT IS HEREBY ORDERED** that Defendant Jorge Luis Bojorquez's "Motion to Suppress Evidence with Incorporated Memorandum of Law," ECF No. 41, is **GRANTED IN PART** insofar as Mr. Bojorquez's requests that all of Mr. Bojorquez's pre-Miranda statements and any of his post-Miranda statements that are related to the substance of his pre-Miranda statements are suppressed, and such statements shall be **SUPPRESSED**.

**IT IS FURTHER ORDERED** that Mr. Bojorquez's "Motion to Suppress Evidence with Incorporated Memorandum of Law," ECF No. 41, is **DENIED IN PART** insofar as Mr. Bojorquez requests suppression of any further statements and testimony.

SIGNED this **24** th day of **August 2021**.


_____
**THE HONORABLE DAVID BRIONES**
**SENIOR UNITED STATES DISTRICT JUDGE**